THE NEW ORLEANS, JACKSON AND GREAT NORTHERN RAILROAD COMPANY *v.* STEPHEN ALLBRITTON.

1. EVIDENCE: PHYSICIAN: EXPERT.—It is not necessary, that a physician should be a graduate of a medical college, or have a license from any medical board to practice, in order to render him competent to testify as an expert, in relation to matters connected with his profession.

2. DAMAGES: EXEMPLARY: WHEN COUNSEL FEES ALLOWED.—In cases, proper for the infliction of exemplary damages, the jury in estimating those damages, have a right to take into consideration the probable expense of the litigation, to which the plaintiff has been subjected, in order to obtain redress for the wrongful act of the defendant; and it is therefore competent for the plaintiff to prove, before the jury in such a case, the reasonable and proper charges of his counsel.

3. BILL OF EXCEPTIONS: CANNOT CONTAIN WHAT IS A PART OF THE RECORD.—

It is the office of a bill of exceptions, to make a part of the record, such extraneous matters as do not necessarily constitute a part of the record in the cause; and therefore, no proceeding in the court below, which is necessarily a part of the record, can be certified to this court through the medium of a bill of exceptions.

4. HIGH COURT: RECORD; MOTION FOR A NEW TRIAL A PART OF: HOW CERTIFIED TO THIS COURT.—A motion made in the court below for a new trial, is a necessary part of the record in the cause, and cannot therefore be certified to this court in a bill of exceptions.

5. SAME: SAME.—This court will not revise the judgment of the court below on granting or refusing a new trial, unless both the motion for a new trial and the judgment thereon be certified to this court, as a part of the record in the cause, otherwise than in a bill of exceptions.

6. RAILROAD LAW: PRINCIPAL AND AGENT: COLLISION EVIDENCE OF NEGLIGENCE.—In an action by a passenger on a railroad, to recover damages against the company, for an injury done to him, by a collision, proof that a collision did take place, and that the plaintiff was thereby injured, is *prima facie* evidence of negligence or want of skill on the part of the servants of the company; and it casts the burden of proof on the company, to show that its employees in charge of the colliding locomotive, were in every respect qualified, and that they acted with reasonable skill and the utmost caution, and that the collision could not have been prevented by any human care or foresight.

7. PRINCIPAL AND AGENT: LIABILITY OF PRINCIPAL FOR TORTS OF AGENT.— In all cases where it appears, that the employment of the principal afforded the agent the means and opportunity, which he used, while so employed, in committing an injury to a third person, the principal is responsible, whether the injury results from the negligence, or the wilful and malicious conduct of the agent.

8. SAME: SAME: RESPONSIBILITY OF RAILROAD COMPANIES FOR ACTS OF EMPLOYEES.—Upon a principle of public policy and public necessity, the rules of law which fix the liability of the principal for the torts of his agent, are applied with strictness to common carriers; and especially to those using forces for the propulsion of their carriages, which are calculated to endanger life or property.

9. SAME: SAME.—A railroad company impliedly warrants, that its engineers, conductors, and other employees engaged in running its trains, are possessed of due skill, and are competent and faithful; and it is liable under all circumstances, for any injury occasioned by the misconduct, rashness, or negligence of such persons; and where an injury is caused by the gross negligence, or wanton and wilful misconduct of its employees, it is liable for exemplary damages.

10. EVIDENCE: WITNESS: PARTY'S INTEREST MAY BE CONSIDERED BY JURY.—The jury in determining the weight and credit to be given to the testimony of a party to the suit, have the right to consider of his interest; and it will be error therefore for the court to charge the jury that they cannot disregard the testi-

mony of a party; unless his manner and conduct, in giving in his testimony, and the evidence of the other witnesses in the cause, satisfy them that what he said is false.

ERROR to the Circuit Court of Copiah county. Hon. John E. McNair, judge.

This was an action by the defendant in error against the plaintiff in error, to recover damages, sustained by him from a collision of the passenger and mail trains of the railroad company, and on one of which the defendant was being conveyed, as a mail-route agent, under the employment of the Post-Office Department.

The declaration alleged, that the collision took place, between the up and down mail and passenger trains of the company, on the 16th of July, 1858, near Bahala Station, in Copiah county; and that plaintiff (below) being mail-agent as aforesaid, was in the mail car next to the tender, or wood car, which last was driven into the mail car, crushing it to pieces, and striking the plaintiff, whereby he was greatly and permanently injured in health, and shocked, and jarred, and much frightened; and that the collision was caused by the "gross negligence, carelessness, misconduct, and mismanagement of the servants, agents, and conductors of the railroad company," who were there and then engaged in running, managing, and controlling said trains. The damage claimed was $20,000.

The defendant pleaded a general denial of the allegations of the declaration.

On the trial, the plaintiff proved that he was travelling on the "up" train, as mail-agent, on the 16th July, 1858; that the "down" train was behind time, having been delayed by the breaking of an axle; that when the "down" train arrived at Bahala Station, the engineer was ordered by the conductor to stop until the "up" train, which was then momentarily expected, should pass; that the conductor stepped off the train and went into the depot station, and whilst there, the engineer, without giving any warning, by ringing the bell or sounding the whistle, started the train; that just as he was starting, the "up" train was heard approaching, and a bystander so stated to the engineer, and asked him "if he was then going to start." That the engineer made no reply, but put his

train in motion; and that about four hundred yards from the station the trains met, smashing up the locomotives and tenders; that the collision was violent, the "up" train being then running at the usual speed; that plaintiff was in the mail-car, next to the tender of the "up" train; that the tender was driven into the mail-car, and mashed it up for about half its length. After the collision, the plaintiff was seen tumbling or falling out the side door of the mail-car; he fell on the ground, and called for help, and complained of being much hurt; he was assisted to the platform of the station, and on the next day travelled on the cars a short distance, to the station nearest his residence, and then went home in a buggy.

The plaintiff himself testified, that when the collision took place he was stooping over the mail-bags, assorting the mail, preparatory to delivering it at the next mail station; that whilst in this attitude, the "tender" struck him on the left hip, near the spine, and passed over him, and that he then caught hold of a piece of timber, and scrambled to the side door and escaped; that he was much shocked, bruised, and frightened; that he called for assistance, and was helped to the platform, and thence went home, as before stated; that his health is much worse since the injury, and that he suffered a great deal from it; that he is fearful that the injury is permanent, but hopes he may entirely recover; that he did not send for a physician at the time, nor until three weeks afterwards, when he called in Dr. Simms; that he has been compelled to employ and pay others to attend to his duties as mail-agent a part of the time, since the injury; has paid physician's bills to the amount of $60 or $80, and that he is bound, at all events, to pay his attorneys in this case $250.

Cross-examined. He stated that he had been a cripple, from white-swelling in his left leg; that he had long since recovered from the white-swelling; that he had been afflicted with a cough for several winters; that in the winter of 1855, he had hemorrhage of the lungs and a severe cough, and thought he would die; and in 1856 and 1857, he also had the cough, though it was not so violent; this cough has been much worse since the injury; that he received $800 dollars per annum salary, as mail-agent, and continues to receive it; that he never has engaged in hard work; has taught school, wrote as a clerk, and generally held some office; that he has

a wife and four children dependent on his labor for a support; that he was confined three weeks after the injury, and during that time he sat up in his piazza, walked about a little, and rode on horseback; that since the injury he has travelled to Washington City and returned, by railroad and stage, and that the trip each way was seven days. He also stated that he heard the alarm whistle just before the collision, but was busily engaged in assorting the mail, and paid no attention to it.

Dr. Simms, for plaintiff, stated, that about three weeks after the collision he was called to see plaintiff. He had a slight cough and some fever, and complained of pain in his back and loins. Witness had heard plaintiff's testimony on the trial, as to his condition after the injury. He was then asked, by plaintiff's counsel, "if the injury detailed by plaintiff, would produce the pain and cough spoken of by him?" This was objected to. The court asked, if it were admitted that witness was a physician? Defendant's counsel said it was not. Witness then, being examined on that subject, stated, that he was a practising physician, and had been for six years. Cross-examined, he said he was not a graduate of any medical college or institution, and had no license to practise medicine, but that he had attended one course of medical lectures in New Orleans, and had studied the science three years before he commenced the practice. Thereupon the defendant moved the court to rule out his evidence, and reject him as a medical expert. This the court refused to do, and the defendant excepted. The witness then stated, that he did not examine plaintiff particularly; did not examine his loins, spine, or hips. Plaintiff did not request him to examine him. Plaintiff said he had a pain in the spine, and a cough, and witness took his word for it. Witness did not know then, that plaintiff had ever had hemorrhage of the lungs.

Plaintiff then introduced F. Sturges, a practising lawyer, and asked him what would be a reasonable lawyer's fee in the case on trial. This question was objected to by defendant, but his objection was overruled, and he excepted. The witness then stated that a reasonable fee would be from $300 to $500.

The defendant proved, by cross-examination of several of plaintiff's witnesses, and others, that Odell, the engineer in charge of the colliding locomotive, was a very efficient one, and occupied the

first rank in that profession. That always, up to that period, he had been careful and obedient to orders. That, though occasionally taking too much liquor when off duty, he was never known to drink whilst engaged in running a train. It was also proved that the day on which the collision took place was very hot, and that the engineer had been engaged for several hours at very hard work, in mending the broken axle, and had ceased therefrom but a few minutes before the arrival of his train at Bahala Station. It was also shown, that the engineer was badly hurt by the collision, and none of the witnesses, many of them being employees of the railroad company, had seen him since the day of the collision, or knew where he was. Before the collision, he was seen with a bottle which belonged to one of the passengers, but it was not known what the bottle contained, or whether he drank from it or not.

The defendant proved by several witnesses who had known plaintiff from fifteen to twenty-five years, that he was always a "weakly and complaining man; that he had had white swelling in his youth, and had been a cripple therefrom ever since; and that he always had a cough in the winter, and that before the collision, he had employed his father and son, on several occasions, to attend to his duties as mail-agent." These witnesses thought from his appearance and conduct at the trial, that he was then in as good health as ever. It was also shown that by the rules of the company, the engineer was bound to obey the orders of the conductor on his train.

The court, at the instance of the plaintiff, instructed the jury as follows:

1. "That if the jury believe from the evidence, that the collision in question was caused by the act of omission or commission, whether negligent, fraudulent, or deceitful, of the defendant's engineer, the defendant is liable.

2. "That it is not any justification to a railroad company, that a collision was caused by the acts of the engineer, done in disobedience of the commands of the conductor, to whom he owed obedience.

3. "That in actions of this kind the jury are authorized, in estimating the damages, if they think proper, to take into consideration loss of health and time; disability of limb, so as to prevent a party from pursuing his usual employment; bodily pain and suffering, which are proved by the evidence as reasonably certain to re-

sult from them ; and mental suffering, as fright arising from the risk and peril, where actual injury to the person has been shown."

The 4th and 5th instructions given for plaintiff, and the 4th instruction asked by defendant, and the modification of it made by the court, are set out in the opinion of the court.

The defendant asked the following instructions :

" 1. If the jury believe from the evidence that the defendant used due care and diligence, in the preparation of their cars, and management of the same, for the carriage of passengers, this is all the law requires of the defendant."

This instruction was refused as asked, but given after being modified as follows: " If the jury believe, from the evidence, that the defendant used due care and diligence in the preparation of their cars and management of the same, so far as the travelling public are concerned, and third persons, this is all the law requires."

· The 2d instruction asked by defendant was as follows:

2. " The defendant cannot be made amenable for those casualties which elude human sagacity, and against which no prudence is sufficient to guard; and if the jury believe that the defendant could not have foreseen the misconduct of Odell, which brought about the injury to plaintiff, they will find for the defendant."

This instruction was refused.

The jury returned a verdict for plaintiff for $10,000.

A motion for a new trial is set out in the bill of exceptions, but it appears nowhere else in the record.   The bill of exceptions also states that this motion was overruled.

An amended record, after stating the style and term of the court, and the style of the case, contains the following, being a copy from the minutes of the court : " The motion of the defendant for a new trial in this case, is by the court overruled, and new trial refused."

The defendant sued out this writ of error.

*W. P. Harris*, for plaintiff in error.

The action in the court below was to recover damages for an alleged injury to the person of the plaintiff, occasioned by a collision between the "up" and "down" trains of cars on the company's railroad.   The collision was occasioned by the act of the engineer of the "down train," who, contrary to the positive orders of the

conductor, started from a way station, where he was told to wait for the "up train," which was momentarily expected.

The proof is very positive, that the engineer of the down train was ordered not to move from the station, until the up train passed. An accident had delayed the down train, and on reaching the way station, the train stopped, and the conductor went into the station-house, and the engineer, not heeding the order to stop, started the train, without ringing the bell or sounding the whistle, as the rule required. As he was in the act of starting, the up train was heard approaching. The collision took place one-fourth of a mile from the station. The plaintiff, aged about forty-seven years, was mail-route agent, and was in a car appropriated to his use on the up train. The collision was severe, both locomotives were broken, and several cars crushed. The tender of the up train was forced into the car of the plaintiff, about half its length, crushing it partly. The plaintiff was in the car at the time, and was seen "tumbling" out of the side door. He complained of being hurt, and was seen lying down on the platform at the station-house. He called for help as he escaped from the car.

The declaration charges that he was greatly and permanently injured, so as to be disabled from working: and the extent of the injury was the point to which the testimony was directed.

No medical man or surgeon was called in by the plaintiff to examine or prescribe for him, at the time, or very soon after the accident. One physician was called in about three weeks after the accident. Did not then examine the plaintiff, and was not asked to do so, but took the plaintiff's word for his condition, and prescribed a tonic. There was no proof of any external signs of injury. Two days after the accident, the plaintiff was walking as usual, and exhibited no unusual signs of ill health or injury.

Several witnesses were examined as to the appearance, conduct, and condition of the plaintiff, before and after the accident, and at the time of the trial; and their testimony goes to show, without conflict, that at the time of the trial, the plaintiff was as well as he was before the accident.

On this point, there is no contradiction amongst the witnesses; and it may be affirmed of the testimony of five disinterested wit-

nesses, that for aught that appeared in the conduct and appearance of the plaintiff, he had recovered from the injury, if any had been sustained.

The plaintiff himself stated on the trial, that he was fearful his injury was permanent, but did not know how it would turn out. Since the accident, he travelled to Washington City, by railroad and stage, fourteen days' journey, the longest he ever took in his life. Other witnesses prove that he was constitutionally feeble; was a cripple in his youth, from white-swelling; always had a cough; was a sickly complaining man, who could never work, except in such occupations as did not require bodily exertion; he was diseased in the lungs; that for half the time before the accident, he had others to perform his service as route-agent; that since the accident, he went about his business as usual, walked, rode on horseback, &c.

There was not before the jury any substantial evidence that the injury was permanent, while the evidence by the witnesses very satisfactorily showed that it was temporary, and that he had recovered from it.

The only evidence to the contrary, was that of the plaintiff himself, who says he did not know whether he was permanently injured or not. The absence of any evidence by competent men, as to the true condition of the plaintiff, and the extent of his injuries, leaves the verdict for the enormous sum of $10,000 without any reliable foundation. Take away the plaintiff's evidence, and there is no shadow of foundation for such a verdict.

The court allowed evidence to go to the jury, of the amount of the attorneys' fees. This was objected to, at the time, by the defendant.

The testimony establishes the fact that the engineer was a first-class engineer, sober, trustworthy, and very competent. His previous character and conduct had been altogether without fault. No explanation is furnished for his strange conduct on the occasion, while the proof is positive, that he was twice told that he must not move the train. No negligence is imputed to the company. The engineer stood high in the service for skill and fidelity. There is no evidence that the track or the equipments were deficient.

Under these circumstances, it was not a case for exemplary

damages against the company. Nevertheless, the court charged the jury, that they might give exemplary damages.

It was not a case for the allowance of attorney's fees, yet they were brought into consideration. 23 Wendell, 435.

The court charged the jury upon the weight of the evidence of Allbritton, the plaintiff, in such manner as to leave an erroneous impression on the minds of the jury.

I select for discussion the fourth instruction for the plaintiff, in regard to exemplary damages, as follows: "And may find exemplary damages provided the plaintiff received a bodily injury, and that injury was caused by gross negligence, or wanton and wilful misconduct, of the engineer of the defendants."

On the subject of the testimony of the plaintiff, Allbritton, the court was asked by the defendant to give the following, that "the testimony of plaintiff in his own behalf may be entirely disregarded by the jury, if they think proper;" but in lieu thereof, gave the following, "if they believe it to be untrue, after weighing it, and considering it with reference to all the other facts and circumstances of the case,—they are to weigh it as they weigh the testimony of other witnesses. And then, at the request of the plaintiff, gave as "an explanation" of the above, the following, "To authorize the jury to disbelieve, and consequently to disregard the testimony of a witness, there must be something in his manner or conduct in giving in his testimony, or in the testimony of the other witnesses in the case, sufficient to satisfy the jury that what the witness has stated is false."

The points arising on the other instructions, being fully discussed by the leading counsel, will be noticed. Among these is the position founded on the evidence, that the company is not liable at all, on the authority of McCoy v. McKowen, 26 Miss. 487, citing case by Kenyon, 1 East, 106; McManus v. Cricket, cited by Paley and Story with approbation; Paley by Dunlap, 298; Story's Agency, 623.

But, if liable at all on the maxim respondeat superior, it is clear that circumstances of aggravation must be shown as attaching to the principal.

Punitive damages are designed to punish the guilty. The worst of all examples, is that of a court of justice, or jury, inflicting upon

innocent men, the punishment due only to the guilty. It is well known that the maxim *respondeat superior*, does not carry guilt from the agent to the superior, and the mere relation of principal and agent, is attended with a civil responsibility by construction of law, for actual loss or injury, only in the shape of compensatory damages, unless the principal is in point of fact, chargeable with participation in the act, by consent before, or ratification afterward.

. If an agent or servant does an act against the will of the principal, which act is punished by penalty, the principal is never held liable for the penalty, unless his conduct is such as to implicate him as a participant. Damages, for example sake, or as punishment, are governed by the same principle. When you undertake to punish, you must establish guilt. If you put the sword into the hands of justice, you must point out the guilty party. There is a principle of public policy which requires that principals should be held to account in compensatory damages, for the carelessness or mismanagement of their agents, full measure of compensation,—but no punishment without guilt. The proof in the present case shows that the company had employed a man of high character for skill and fidelity. Nothing in his previous history gave rise to any suspicion that he would be guilty of reckless conduct. No want of care and prudence in officers and equipments is shown.

The liability arises solely, if at all, on the idea that the company stand as guarantors of the infallibility of their agents, but the law throws upon a principal using due and reasonable caution, nothing more than a liability to make good the actual loss sustained. Any other doctrine would be palpably unjust, and at war with the spirit of our laws.

There is no difference as to the measure of damages between railroad companies and other principals. The greater risks and dangers, impose stronger obligations as to careful agents, and good equipments, and management. The same rule determines the extent of the legal liability for damages.

. According to Sedgwick on Damages, 570, to lay the foundation for exemplary damages, circumstances of aggravation must be shown. As to the company, the defendants, no such aggravation is shown. They are the sufferers by an occurrence which stands to-day inexplicable—the supposition is, that the hard work in the heat of the

day had affected his mind—and for which nothing in the conduct or qualifications of the officer prepared them.

It is folly to suppose that an accumulation of heavy verdicts will correct such occurrences, or endow the company with greater sagacity.

It may be stated as an incontrovertible proposition, that no case can be found, in which exemplary damages have been allowed against the principal, for the unauthorized act of the agent, unless the principal has carelessly employed a person known to be unfit, or is in fault in point of fact, in neglecting something which he should have done. In the case of *Vicksburg Railroad* v. *Patton*, the circumstances that the track was out of order, no sufficient brakes, that a lad of seventeen was conductor, and a drunkard, full of reckless mischief (notoriously so), was the engineer, were dwelt on by the court. 1 *Vicksburg Railroad* v. *Patton*, 31 Miss. 156.

So in *Hiern* v. *McCaughen*, two of the owners of the boat, were directly responsible for the act.

In the *Railroad* v. *Hurst*, not reported, the company upheld the agent in an act oppressive to the travelling public, for they refused even to censure the agent, and said he did not deserve it for the act; besides, in that case, it did not appear that in forcing the passenger to get out, the conductor acted contrary to the practice and rules of the company; the inference was that the company did not consider the act wrong, saying the passenger ought not to have been carried beyond his destination.

In the case of Hurst, the agent was executing his employment, but did it in a negligent and an oppressive manner. His act, in putting out the passenger, was sanctioned and supported. Here, the engineer, being under the orders of the conductor, refused to perform his duty, and disobeyed the officer in charge, and acted on his own caprice. A principal, says Story, may become liable for the trespass of his servant, if he sanctions and adopts it.

The books may be searched in vain for any decision or dictum, affording sanction to the doctrine, that a principal, a railroad company, with their equipments prepared with care and prudence, with officers whose previous history gave evidence of nothing but great skill and trustworthiness, are the proper objects of vindictive damages, because such officers suddenly and unaccountably, from

sudden insanity, or other cause not known or anticipated, violate positive instructions, and wilfully bring on a collision, or cause injury to others.  The case of *Railroad Company* v. *Derby*, 14 How., is an authority for holding the company to a strict responsibility; but it says nothing of exemplary damages.

In the case in 23 Wendell, 435, a case of collision, the court take it for granted, that it is not a case in which the jury could be allowed to adopt any other rule of damages, than the injury naturally and reasonably resulting from the accident.

On what principle, can we hold that the wilful and mischievous conduct of the servant, in direct disobedience of orders, with no knowledge on the part of the principal of the character of the servant, or carelessness in examining his character, shall entail punishment on the principal, in any shape.  The case of Derby, in 14 How., is a strong case for holding the principal for actual damages, for wilful and reckless acts of agents, against positive commands.  It is a strong case founded on what is deemed to be policy in regard to carriers—or persons engaged in transporting passengers on railways by steam—but certainly it will not be carried beyond its scope.

The authorities cited by the court in *V. R. R.* v. *Patton*, are authorities for exemplary damages, against guilty or negligent principals in the act, when aggravating circumstances are shown, but no authority is cited, or can be found, for taxing a principal without fault in fact, with more than the damages reasonably and fairly resulting from the act of the agent.  On this point, I feel confident that the court below erred in giving to the jury the sword of punishment, with liberty to use it—the guilty agent not being sued.  In this case, the instruction was wrong, because no one can read the evidence, and believe that the injury to the party called for such a verdict.  It was the conduct of the engineer which provoked it; that alone afforded the least ground for such a verdict; and if the engineer had been sued, it would have been well; but in a suit against the principal, not in fault, for consequential damages for having such an agent, it was unwarranted.

The court erred in its instructions to the jury, on the subject of the witness Allbritton, who testified under the Code, p. 510: "The jury shall give such weight to the testimony of parties and interested

witnesses, as in view of the situation of the witness, and other circumstances, it may be fairly entitled to." This is the language of the statute. It is questionable, whether the court ought in any case to instruct as to the credit due to a particular witness. It is a very delicate duty, and great caution should be employed. In this case it was all important, for the extent of the recovery depended on the testimony of the plaintiff. There were disinterested witnesses opposed to him. He was deeply concerned, and the statute says the weight to be given to him must be measured by his situation. Clearly, the jury may give less weight to his evidence than to that of others not so situated,—may fairly say, though we are not satisfied that he has sworn falsely, yet testimony of a less suspicious character is before us, and we will take that as the basis of our verdict. The court, however, evidently gave the idea, that some contradiction, or suspicious manner must appear, in order to justify the jury in taking the unbiassed evidence, instead of the biassed evidence. They cannot disbelieve him unless he is contradicted, or his manner indicates that his testimony is false. In other words, the court put the witness on the footing of the other witnesses not interested, and required impeachment, by contradiction of his statements, or suspicious manner. The situation of the man, as being directly interested to get a large sum of money, without regard to manner, or what other witnesses may state, may and should determine the jury to adopt the statement of other witnesses in preference to his, or refuse to give full weight to it. They may disbelieve and disregard his evidence from the single circumstance, that he is greatly interested to get a verdict, even if they should merely doubt of its truth, and not be satisfied that it is false.

The court refused to charge, that they might in the particular case before them, disregard his evidence; and then departing from the statute, instructed the jury, that they could only disregard his evidence, because satisfied it was false; and to authorize them to disbelieve it, they must be convinced, from his manner or from contradictions from other witnesses, that it is false.

The opinion prevails in some minds, that in taking off the disability to testify, the statute has given some weight, by its own force, to the testimony of parties; and that the jury is to regard them as other witnesses not interested, and cannot without some cause which

would justify disbelief in a disinterested witness, make a difference in the weight given to them.

The statute, on the contrary, expressly gives to the jury the right to attach just such weight to his evidence, as in the particular case, in view of his situation, they may think it fairly entitled to. They may give it more or less; they may reject it utterly, although the manner of the witness may be good, and his statement not improbable; because, as prudent and conscientious men, where doubt exists, they may disregard the testimony, and take that which experience teaches is the most reliable, without having any clear conviction that the evidence of the party is false.

Allbritton testified as to internal injuries not visible to the eye. No physician examined him. He was not contradicted. He could not be contradicted. He was directly interested to get damages. The court, in effect, told the jury that there was a rule of law forbidding the rejection of his evidence, unless it was believed to be false; and that such belief, by a rule of law, must be founded, not on his situation as an interested party, but on his manner, or in the testimony of other witnesses.

It was a case in which, in view of his situation, the jury might have refused to be guided by him, though his manner was perfect, and no contradiction existed; because he could not be contradicted as to his internal sufferings. The statute did not intend to bind the jury by any such rule as that declared by the court. The statute instructs the jury to weigh the evidence, by the situation of the witness, *i. e.* his interest. The court omits this important direction, and limits the jury to his manner, and the testimony of other witnesses, as the ground of unbelief. This is wrong, even with regard to a disinterested witness; but clearly it is a limitation of the power which the statute intended to confide to the jury.

The case of *Allen & Co.* v. *Lyles*, Op. Book, 278, not reported, has so exactly stated the error of such an instruction, that we need only refer to that case. There the court did charge in the language of the statute, at the instance of the plaintiff; but at the instance of the defendant said, "If an interested witness is uncontradicted, and the jury see nothing in his manner, his position in the cause, and his demeanor on the stand, to excite suspicion, they are bound to receive his testimony."

New Orleans, Jackson, and Great Northern Railroad Co. *v.* Allbritton.

The court held that this applied a test, which the statute did not design to apply, and was consequently error.

There can be no difference between this charge, and the fifth charge given in this case, which undertakes to state the only grounds on which the jury may disregard the evidence, and propounds a rule more stringent,—that unbelief can only be founded on manner, and the testimony of other witnesses. It was a direct interference with a power confided by the statute to the jury, in language intended to give them greater latitude of discretion.

*J. D. Freeman,* on same side.

1. It is not shown by any proof, that the defendant was employed by the Post-Office Department to carry the mail, or the plaintiff,—and the plaintiff did not prove that he paid his fare, or had any right to be on the train. So far as the proof goes, it does not appear but that he was a trespasser, and he cannot recover. Pierce R. R. Law, 245, 284, 484; 9 Foster R. 9; *Schopman* v. *Boston and Worcester R. R. Co.* 9 Cush. 24; *Robertson* v. *New York and Erie R. R. Co.* 22 Barb. 91.

2. The plaintiff charges, in his declaration, as the gravamen of the complaint, that he was permanently injured. This is clearly disproved by the testimony (and here Genl. Freeman reviewed the evidence very elaborately, to sustain that position).

3. The jury were not authorized to allow vindictive damages in this case. The declaration attaches no blame to the company. The proof shows that all the servants of the road performed their duty except the engineer, and he positively disobeyed the printed rules of the company, and the directions of the conductor, who was his superior officer, and entitled to control his actions. The disobedience of the engineer brought on the collision, and the collision accidentally injured Allbritton. It was not the wilful act of the road. The road forbid the act, by its conductor. The engineer had always proved himself competent, faithful, and obedient. It was impossible for the company to foresee the act complained of. The declaration does not charge the defendant below with fraud, malice, gross negligence, or oppression. Nor does the proof show such a state of case. The proof shows conclusively, that defendants did all that human foresight could do to prevent the collision,

and hence it is impossible to impute criminality, or immorality, or gross negligence to them.   The defendants were, therefore, not within the extreme rule laid down for exemplary damages by Mr. Sedgwick, 39; 2 Story on Contracts, 700, § 1022, a. note 4; 2 Greenl. Ev. § 253, note 2, pp. 276, 284, 285, note to 291.

Mr. Greenleaf reviews all the authorities, controverts, even the rule laid down by Sedgwick, and insists that " all damages should be precisely commensurate with the injury, neither more nor less, and this whether it be to his person or estate." 2 Greenl. Ev. 276, § 253.   *The Amiable Nancy*, 3 Wheaton, 546.   Under these authorities, the admission of counsel for defendant in error, that " the finding was evidently not based on the extent of the injury," . . . and that it is " idle to pretend that this verdict was given as a cash value assessment,—it is a smart money, a punitive verdict, demanded by the highest public considerations, and the extent of the particular injury had nothing to do with the conclusion of the jury;" must be fatal to his cause.

While it is true, that railroad companies in this State are, by statute, responsible for the acts of their agents, this responsibility does not extend beyond the actual pecuniary injury inflicted by the agent, while acting within the scope of his duty as agent.   The idea that a corporation can be criminally punished by fine, beyond the actual injury inflicted by its agents on third parties, is, to my mind, monstrous in the extreme.

The engineer in the case at bar, would be punishable by fine and imprisonment,—the company could not; they show a perfect defence ; they were not *particeps criminis.*   Could a master be punished, if his slave killed another with his master's gun or axe ?

Unless there be evidence tending to show negligence on the part of a railroad company, sued for injuries done by its servants, it is error to submit the question to a jury. *N. Y. & E. R. R.* v. *Skinner*, 19 Penn. (7 Harris), 298.   In the case at bar, there is no charge of negligence by the company.   The charge is against the servants of the company.

4. An agent is personally liable to third persons, for his misfeasance, and positive wrongs ; but he is, ordinarily, only responsible to his principal, for his omissions and nonfeasances in the course of his duty.   1 Story on Cont. 245, § 171.

The proof in this case is, that the collision occurred by the refusal of the engineer to obey orders. He was twice directed by the conductor, his superior officer, to stand on the sideling until the coming train passed. In disobedience of these orders, and without ringing his bell to notify the conductor of his intention to move, he started off, met the other train, and caused the collision. Was not this a misfeasance, a positive wrong ? and is not the engineer personally liable to Allbritton, for the injury arising from this act ? If so, how can the road be liable ?

The engineer was not the agent of the company, to run the train whenever and wherever he pleased. He could only move by direction of the conductor. He had no authority to disobey the conductor. His act was criminal, and bound only himself.

, The court is referred to the argument of my associate, Judge Harris, for a full discussion of the doctrine of *respondeat superior*, which, in my judgment, relieves the road from vindictive damages.

5. A plaintiff suing for damages to himself, is bound to show, that he used due diligence to avoid the injury, and failed, by reason of the negligence or criminality of the defendant.

In the case at bar, Allbritton admits that some time before the collision occurred, the conductor of the train on which Allbritton was travelling, blew the alarm-whistle ; but Allbritton says he was busy, and paid no attention to it.

Harris, the conductor, a witness for plaintiff, and who blew the alarm-whistle, jumped off the train without injury. Allbritton admits there was a side door to the car he was in. He made no effort to jump off, or save himself, as Harris did. He was warned of the danger, but heeded it not : he was busy. "Where there has been mutual negligence on the part of the plaintiff and defendant, and the negligence of each was the proximate cause of the injury, no action can be maintained." 23 Vermont Rep. 393 ; 24 Ib. (1 Dean) 487. If the plaintiff's negligence in any way concurred in causing the damage, he is not entitled to recover. Angell on Carriers, 535, § 556, notes 1, 2 ; Ib. 536–639, § 557. Nor is such negligence or carelessness restricted to the moment of the accident, " nor confined to such degrees as amount to rashness or recklessness. Speed in the transit, and punctuality in the arrival of the trains, are required, and are lawful." See 16 Illinois, 198, 558.

6. The instructions were erroneous.

The first instruction to the jury for plaintiff was erroneous.

1st. It is not applicable to the case. Neither the defendants nor their engineer are charged, in the declaration, with fraud or deceit: there is no proof of either. It misled the jury.

2d. It charges that defendants below were liable, without stating what they were liable for. Taken in connection with the fourth instruction for plaintiff, it means that they were liable for punitive damages, for the fraud and deceit of their engineer, without confining it to the scope of his duty as engineer.

The second instruction is erroneous, because taken in connection with another instruction for plaintiff. It charges the jury, that the company are liable for punitive damages, for the wilful act of their engineer, in disobedience of the orders of defendants.

Compensatory damages is all the law allows in such cases. 2 Greenl. Ev. 276, n. 2; Ib. 291.

The fourth instruction is erroneous, because it charges the jury that they may find all actual and consequential damages arising from the collision, and may also find exemplary damages, if the injury was caused by the wanton or wilful misconduct of the engineer. This makes the defendants pay all the actual damages, and in addition thereto, punishes them for an act which they tried to prevent. See previous authorities on this point.

In *Austin* v. *Wilson*, 4 Cush. 273, it was held, that punitive damages, if ever recoverable, cannot be recovered in an action for an injury which is also punishable by indictment,—as libel, and assault and battery. See 10 La. R. 238; 4 Cush. 273; *Whitney* v. *Hitchcock*, 4 Denio, 461; *Taylor* v. *Carpenter*, 2 Woodb. & Minot R. 122.

If the railroad company are responsible in punitive damages, it is alone on the ground of criminality, and because they have been guilty of an assault and battery on Allbritton, by means of the careless management of their cars; and hence, upon this principle, they would be indictable, and liable to a heavy fine and imprisonment. But the company were not the guilty party. The assault and battery was committed by the engineer, contrary to the orders and rules of the company and its conductor.

The engineer is indictable for assault and battery on the proof

in the cause. He is liable to. fine and imprisonment. The State may fine him $10,000, and that added to the fine against the present innocent defendant, will make the punitive damages $20,000. Can such a monstrous result be arrived at under the sanction of law. The damage to be recovered, must always be the natural and proximate conséquence of the act complained of. This rule is laid down in regard to special damage; but it applies to all damages. 2 Greenl. Ev. 293, § 256, n. 5.

It is admitted by counsel for defendant in error, that the damages assessed by the jury in this case, are not the natural and proximate consequences of the act complained of. He says it is idle to pretend such a thing; that the verdict is for "smart" money, demanded by the public interest, &c.

The cases of Hurst and Patton, decided by this court, have been reviewed by Judge Harris, my associate, and are believed to be reconcilable with the law as above stated.

The fifth instruction given for plaintiff, in lieu of the fourth instruction refused to the defendants, is palpably wrong, and violates the express letter of the statute, on the subject of the testimony of interested parties to suits.

The defendants asked the court to instruct the jury, that " the testimony of the plaintiff by himself, may be entirely disregarded by the jury if they think proper."

This is substantially the meaning of the statute. An interested party is made competent; but the fact that he is interested, places his evidence at the discretion of the jury. For instance, where a recovery depends on the testimony of the plaintiff alone, and the jury find for the defendant, notwithstanding the proof of plaintiff covers the case, would a new trial be granted ? Clearly not,—why ? Because the statute says, " The court or jury shall give such weight to the testimony of interested parties, as in view of the situation of the witness, and other circumstances, it may be fairly entitled to." Code, 510. If the trial be before the court, as it may be by consent of parties, then the witness is to be judged of by the court; but if the trial be before the jury, then the jury alone are to judge of the witness and his evidence; and it is clear that they have the discretion to disregard his evidence if they think proper. It was, therefore, error to refuse this instruction.

It was also equally erroneous to grant the modification No. 5, given for plaintiff, because it states a rule wholly different from the statute, and places an interested party, as a witness, upon the same ground of credibility as a disinterested witness.

In Louisiana, free negroes are competent witnesses against white persons. But the jury may disregard their evidence if they think proper.

The case of *Allen & Co.* v. *Lyles*, recently decided by this court, covers this point of exception fully. See 37 Miss. R.

The first instruction asked for defendants and refused, is substantially taken from the opinion of this court, in the case of the *Vicksburg and Jackson Railroad Company* v. *Patton.*

It was therefore the law, and erroneous to refuse it.

The second instruction asked by defendants and refused, simply states a well-established principle, that a party cannot be held responsible for casualties which elude human sagacity, and against which no prudence is sufficient to guard.

Had Odell, the engineer, been suddenly stricken with insanity, as he probably was; or stricken by lightning, or seized with an apoplectic fit, would the road be responsible? Is man or corporation responsible in damages for the act of God? Must a railroad corporation be omnipotent, omniscient, and omnipresent? Does their charter invest them with a character more than mortal? The refusal to give this instruction misled the jury.

The modification of the fourth instruction asked and refused for defendant, is erroneous, because it classes a witness who is an interested party, with " all the witnesses in the case."

It placed Allbritton, the plaintiff, and the chief witness for himself, on the same ground of credibility as all the disinterested witnesses.

In the case at bar, the amount of damages to be recovered by Allbritton depended solely on his own evidence. He was the only witness who proved the extent of his own injury. The other witnesses who speak on this subject say, that Allbritton said he was hurt. Andy Ray says he appeared to be hurt; but there was no visible wound or bruise. The alleged bruise on the hip was never seen by any human being, not even Allbritton himself. He says

he felt a pain there, but he admits that it was the hip of the same leg which had been crippled, so that he could not walk on it for eight years of his life, and until he was a grown man.. He walked as well after the collision as he did before, and better than for eight years of his previous life. He travelled and went about the same as formerly; and five or six witnesses who had known him all these years, testify, that he appeared to be as well in a short time after the collision, as he did before the collision.

Had he relied on the evidence of disinterested witnesses, his damages would have been nominal, not exceeding $500. By his own testimony, he procured $10,000. What a temptation for a poor man, with a family to support, to swear to a lie, especially as he swore to an internal injury, which other eyes had failed to see, and could not speak affirmatively about. Look at the enormity of this case. Dr. Simms never examined Allbritton's person at all. He only knew what Allbritton told him. None of Allbritton's family were introduced to prove his wounds and bruises. No person who was present at the collision saw any wounds or bruises. None have ever been made visible to human eyes since. He had been on the brink of the grave with white-swelling, and ulcerated lungs, all his life. He was apparently as well after the collision as before. The disinterested testimony proved conclusively that he had received no permanent injury; and that he had recovered from his temporary fright, and jar of his body. His case was lost but for his own testimony. He was suing for $20,000. He wanted the money, and he testified for money, and not to tell the truth. He testified for money, not for justice. There was no visible evidence of his injury; and, if internally injured, it must have been the effect of a wicked mind, rather than of a bruised body.

*George L. Potter*, for defendant in error.

This was an action to recover damages sustained by Allbritton, from a collision of the passenger trains of the railroad company, on the 16th July, 1858. The charge is, that it was caused by the gross carelessness, negligence, misconduct, and mismanagement of the servants of the corporation. The pleas were not guilty, and general denial. The verdict was for plaintiff, $10,000.

New Orleans, Jackson, and Great Northern Railroad Co. *v.* Allbritton.

The case comes here on exceptions to the rulings of the court.

The fact of the collision is undisputed. It took place near Bahala depot, and seems to have been caused by the act of Odell, engineer in charge of the down train; the plaintiff being on the up train, in a mail car next to the tender.

McGrath, conductor on the down train, says it had been delayed by breaking an axle, and was behind time. It seems that he had control of the train, and had ordered Odell to remain at Bahala depot, until the up train should pass. Odell started off, contrary to his orders, without giving the usual signal, and leaving him behind.

Ray says he was at the depot and saw the collision. "Heard the up train coming; the down train was about starting; told Odell the up train was coming; told him so twice; Odell turned his head, but did not mind him."

As to the speed of the train, Hawkins says: "The down train came pretty fast; made pretty good time." As to the distance run from the depot, he says the collision took place "three or four hundred yards below Bahala depot." Harris, conductor on the up train, says, "The collision took place one-quarter of a mile from the station;" and that his train was running on its time.

It thus appears that the up train was nearly due at that depot; might be looked for immediately; and was, in fact, coming at the usual time. It was so near that Ray heard it coming, as he stood at the depot, before the down train started. And the trains, in fact, met within some three or four hundred yards of the depot. It would seem great negligence to start, under such circumstances, at all; it was madness to start and run at the "pretty fast" rate proved by Ray.

We do not know how far down the road a train might be seen, but these trains met in sight of the depot. Ray, standing there, "saw the collision."

If we suppose the two trains ran at equal speed, the up train was about half a mile distant when Odell started from the depot; or, if we count by time, it would arrive in about one minute and a half. The up train was expected up on its usual trip, and the down train had stopped at Bahala for it to pass. The proof shows the up train was running on its time, and Odell could not but have

expected it to arrive at any moment. The company attempted no explanation of the course of Odell, though it is shown that he had probably been drinking some. Beyond all question, his act upon the proof, was desperately foolhardy, and a reckless and most wanton outrage upon the passengers, whose lives were intrusted to his care.

It is said he was competent, skilful, and previously obedient to orders ; and that he, in this instance, disobeyed the express order of a superior agent of the company.

But all this constitutes no excuse. " It is in vain that the person employed is skilful, if he neglect to use that skill. Public carriers of passengers not only engage for the competent skill of their employees, but for its faithful and continued application." *Gillenwater* v. *M. & I. R. R.*, 5 Ind. 341.

It is a settled rule, that the principal not only holds out his agent or servant as competent to discharge the duties imposed on him, but " warrants his fidelity and good conduct, in all the matters of his agency." Story on Agency, § 452.

This rule has been sanctioned and applied by this and other courts, to the case of a railroad engineeer. *Vicksburg R. R.* v. *Patton*, 2 Geo. 197 ; *Phila. R. R.* v. *Derby*, 14 How. 486.

.Under this rule, the principal is accountable in case of a " tortious conversion" by his agent. Story on Agency, § 453.

In *Saltonstall* v. *Stokes*, the Supreme Court approved, as correct, an instruction, which required a stage proprietor to prove that his driver was " a person of competent skill, of good habits, and in every respect qualified, and suitably prepared for the business in which he was engaged ; and that he acted on the occasion (of the injury), with reasonable skill, and with the utmost prudence and caution ;" and that, if the disaster was occasioned " without the least negligence, or want of skill or prudence," on the part of the driver, the proprietor would not be liable. 13 Pet. 190, 191. The driver must not only possess the necessary qualifications, but must exercise his capacity at the time of the disaster ; there must be no shortcoming, not " the least negligence, or want of skill or prudence." Story says, the proprietor is liable, if the driver is " guilty of negligence, rashness, or misconduct, or mischief ; or deviates from the acknowledged custom of the road ; or if, by incaution, he comes in

collision with another vehicle;" or if his driving "amounts to rashness." Story Bailm. § 593–598 ; 13 Pet. 191.

In the *Phila. R. R. Co.* v. *Derby*, the engineeer acted in violation of orders ; and his character was proved to be as good as they claim for Odell. He was shown to be "careful and competent," and never before guilty of disobedience to orders ; but the company was held liable for damage caused by a collision, produced through his misconduct.

In that case, the Supreme Court said : "When carriers undertake to convey by the powerful, but dangerous, agency of steam, public policy and safety require that they be held to the greatest possible care and diligence." "Any negligence in such a case may well deserve the epithet of 'gross.'" 14 How. 486.

It was also held that the rule, that "the master is liable, civilly, for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, fraudulent or deceitful." And he is "equally liable, though he forbade the act." Ib. 486.

"The fact that the engineer, having control of the colliding locomotive, was forbidden to run on that track, was not a defence to the action." Ib. 484.

"If such disobedience could be set up by a railroad company, as a defence, when charged with negligence, the remedy of the injured party would, in most cases, be illusive, discipline would be relaxed, and the danger to the life and limb of the traveller greatly enhanced. Any relaxation of the stringent policy and principles of the law affecting such cases, would be highly detrimental to the public safety." Ib. 487.

A carrier of passengers "warrants that his agent shall possess competent skill ; and that, as far as human care and foresight can go, he will transport them safely." 13 Pet. 191.

The carrier of passengers is bound to observe the "utmost" extraordinary care ; and in case of disaster, he must show there was "no disregard whatever of his duties ; and that the damage has resulted from a cause, which human care and foresight could not prevent." Angell on Carriers, § 568, 569.

We are to regard the act of this engineer precisely as if done by his principal. "Whatsoever is negligently done or omitted is, as to

the public, the employer's act." "Servants and agents are but the means employed, and what they do, the mode of the employer for the time being." *Gillenwater* v. *M. & I. R. R.* 5 Ind. 341, 342.

"The principal is liable for the negligence and carelessness of his agent, in the same manner, and to the same extent, as if the act was his own."

"It is sometimes thought to be a hard rule, in cases where the principal has not been negligent, or guilty of intentional wrong; but when it is remembered that, even in such cases, some innocent person must suffer, it seems to be as manifestly just as it is clearly the law, that the loss should fall upon him who has put it in the power of another to commit the injury, and for whose benefit and advantage the force was employed." *Railroad* v. *Keary,* 3 Ohio State, 207.

So far as the passengers are concerned, the liability of the company for the act of the engineer, is precisely the same as if the directory had formally ordered him to do that act.

The very fact given in proof, the breaking of an axle, to show why the down train was behind time and out of place, is, as it stands unexplained, evidence of negligence. The company is bound to have its trains complete and perfect; and it would be liable for damages caused by the breaking of an axle, unless it were proved that it had been properly tested, and that the defect in it could not, on careful scrutiny, have been detected.

It has been held, that where a passenger car is run on a road, which is so narrow, in some places, as to endanger limbs projecting from the windows, the car is not properly constructed, if the windows be not so arranged as to prevent passengers from putting their limbs through them. *N. J. R. R.* v. *Kennard,* 21 Penn. 203: U. S. Digest, 1855, 470, §§ 35, 36.

Tested by these decisions, the first and second charges given for defendant in error, are correct. The first is, that the company was liable, if the collision was caused by the act of omission or commission, whether negligent, fraudulent, or deceitful, of its engineer. It seems to have been copied from the opinion in 14 How. 486; 2 Geo. 196. The second, that disobedience is no excuse, is also taken from the same case.

There could hardly be a pretence of objection to the third charge

for plaintiff, unless it be to that part which declares that, in esti-
mating damages, the jury may consider the " mental suffering, as
fright arising from the risk and peril, where actual injury to the
person has been shown."

It has been held, that if there be bodily injury, however slight,
causing mental suffering, that suffering is part of the injury. And
this was held under a statute giving damages for injury to " the
person." *Canning* v. *Williamstown*, 1 Cushing, 452.

. "The circumstances of aggravation, or mitigation, the bodily
pain, the mental anguish, the injury to the plaintiff's business and
means of livelihood, past and prospective, all these, and many other
circumstances, may be taken into consideration." *Linsley* v. *Bush-
nell*, 15 Conn. 236.; *Seger* v. *Barkhamstead*, 22 Ib. 298.

Where a son was killed by disaster, the jury were allowed to take
into consideration the " shock to maternal feelings," which pros-
trated the mother. *Ford* v. *Monroe*, 20 Wend. 210.

It is true, some English cases hold, that when relatives sue for
damages consequent on the loss of a kinsman by such negligence,
the jury cannot consider their feelings caused by such bereavement.
And where a father sues for an injury to his son, the feelings of the .
father are not taken into consideration. But, in such a case, where
the son, the injured party, sues, his mental sufferings may be con-.
sidered on the question of damages. *Cowden* v. *Wright*, 24 Wend.
429.

The first part of the fourth charge, that the fact that the collision
took place, and plaintiff was injured, are *prima facie* evidence of
negligence, &c., and the burden of proof is on the defendant to show,
&c., is but a deduction from the principles we have stated; and
it was so expressly decided in 13 Pet. 192, 193.

The other portion of this charge must be regarded as unexcep-
tionable.

The fifth charge will be considered with those of defendant.

The first charge asked for defendant was refused. It declared
that if defendant use due care and diligence in the preparation of
their cars, and management of the same, for the carriage of passen-
gers, this is all the law requires.

The court gave one in lieu of it, substituting the word " used"
for " use," and substituting for the words " for the carriage of pas-

sengers," these words: "so far as the travelling public and third persons are concerned."

It is manifest the defendant has no cause to complain of this action. The court gave more than defendant could claim. The charge should have been simply refused. There was no proof to the point, nothing to show due care, either in the preparation or management of the cars. The fact of the collision was not controverted; and no excuse was offered, except disobedience of orders. The charge only tended to mislead the jury.

The second charge, plausible in preface, is outrageous in its conclusion, that defendants were not liable, if they "could not have foreseen the misconduct of Odell." They stood his warrantors, that he would not be guilty of negligence or misconduct.

The fourth charge asked for defendant was this: "The testimony of the plaintiff, by himself, may be entirely disregarded by the jury, if they think proper." It proposed to allow the jury an arbitrary discretion to disregard this particular evidence, without cause. They were not called to consider if the evidence was credible, and the like; but were to disregard it as something bad, as coming from the plaintiff, if they so chose. It would not have been fair dealing to plaintiff to give such a charge; and especially not, as he was excepted out of all the witnesses, as the only one whose evidence the jury might thus disregard, if they saw proper.

In lieu of this charge, the court gave the following: The jury are the proper judges of the testimony of all the witnesses; it is their province to weigh and consider that of the plaintiff; and if, after weighing and considering it with all the other facts and circumstances of the case, as shown from the evidence, they should believe it is untrue, they may disregard it.

As a modification of this, at the request of plaintiff, the court gave the following:

To authorize the jury to disbelieve, and consequently to disregard the testimony of a witness, there must be something in his manner or conduct in giving his testimony, or in the testimony of the other witnesses in the cause, sufficient to satisfy the minds of the jury that what the witness has stated is false.

The statute requires the jury to give such weight to the evidence of such a witness, as, in view of his situation and other circum-

270    HIGH COURT OF ERRORS AND APPEALS.

New Orleans, Jackson, and Great Northern Railroad Co. *v.* Allbritton.

stances, it may be entitled *to*. Code, 510, § 190.   It is manifest, from the terms of the act, and from the reason of it, that a party, as a witness, stands precisely as any other witness, except that he is interested in the cause, and may be more liable to prejudice than other witnesses.   The jury are bound to weigh all the facts and circumstances, and cannot arbitrarily reject him.

The intent of this modification asked by plaintiff, does not seem to have been to contradict anything in the charge given by the court; but only to declare that the jury could not disregard the evidence of plaintiff, unless they believed it false.   Such was the evident understanding of the court, or the modification would have been refused.   It is palpable, and the jury must have so understood, that the court did not intend to contradict the charge, which the judge had just before prepared and given.

But it is not material whether this charge was correct or not.   It seems manifest that it did not affect the verdict.

The fact of the collision,—the position of the plaintiff in the mail-car,—that it was badly crushed,—and that plaintiff was injured, are abundantly proved by other witnesses ; and there is no controversy on those points.   Harris proves that plaintiff was mail-agent, and on the up train, in the mail-car, and that it was " mashed in about half its length by the tender."

All the witnesses agree that plaintiff was a weak, sickly man, before and after the disaster ; and the evidence of plaintiff can be regarded as material in the cause, only as showing, that his injuries were greater than other witnesses prove.   Let us see how this is. He proves that he was struck on the left hip, about two or three inches from the back bone ; was badly jarred ; lower extremities paralyzed ; his health was better at the time, than for many years, but not so good since ; has suffered pain constantly in the region of the hip ; has coughed more ; felt sore in his breast, back, loins, and shoulders ; the shock was powerful ; about half the time, is very nervous ; has not been able to labor much since ; is fearful his injury is permanent ; hopes to get well ; was confined to his room, more or less, for three weeks, or a month.

On the evening of collision, about dark, went to Taylor's ; stayed all night ; next morning went to railroad ; went on the road to Bogue Chitto station ; thence to his father's, in a buggy, five miles ; and

OCTOBER TERM, 1859. 271

New Orleans, Jackson, and Great Northern Railroad Co. *v.* Allbritton.

home next day in a buggy; stayed in three weeks, after which he called a physician; took tonic; had good appetite. During the three weeks he so stayed at home, "was in bed some, sat in his chair on the gallery, and rode about some." After the doctor came, took medicine thrice a day; good appetite; tolerable digestion; walked some, rode in buggy and on horseback; now feels sore in left hip. Has had cough and bleeding for some four years; since the injury, his health not very good; coughs and expectorates more; never worked much. Has since made numerous trips to New Orleans and Canton, on the cars; also, in January, went to Washington City in seven days, and back in the same time.

Morgan says, plaintiff was pretty bad off "for three weeks after the collision."

Hoskins proves that, after the collision, plaintiff came tumbling out of the broken car, and called for some one to help him, and complained of being hurt. Witness assisted him. When plaintiff came out, he fell on the ground. After the collision, Ray saw plaintiff lying on the platform at depot. Supposed he was hurt. Dr. Simms saw plaintiff three weeks afterward. He was laboring under an affection of the spine.

Hoover (defendant's witness), proves that, two days after injury, plaintiff complained of injury about the hips, and, on third day, of soreness in his breast that made him cough. Defendant also proved, by Hart, that plaintiff stated, about a week after the injury, how it happened, and complained of a hurt in the left hip, and a jar in the breast and shoulders.

If we look to the other evidence for defendant, and contrast it with that above referred to, it will be clear that the testimony of plaintiff was not material to the issue, and others prove the extent of injury about as fully as he does.

The finding was evidently not based on the extent of the injury, but on the nature of the grossly negligent and wanton misconduct by which it was produced. It is idle to pretend that this verdict was given as a cash value assessment,—it is a smart money, a punitive verdict, demanded by highest public considerations; and the extent of the particular injury had nothing to do with the conclusion of the jury. It is, therefore, idle to claim a reversal on this immaterial charge, even if it be erroneous.

As to all the charges given, this remark applies. It does not appear that any objection was interposed, at or before they were given. Indeed, no objection was at any time suggested, except that defendant quietly "excepted," before the jury retired; and no ground of objection or exception was even then stated. The charges are not made part of the record, except as incorporated in the bill of exceptions. The new Code seems to require something more. It provides, that a party "aggrieved by any charge," may tender a bill of exceptions, "stating therein the matters of law," where the court is supposed to err. Code, 504, § 162. A correct practice seems to require the party to point out, at the time, the supposed error, that the court may correct it. Had it been done here, it is plain the court would have obviated all objections.

It is also objected, that proof was admitted to show what was a reasonable fee in this case, viz., $300 to $500. It does not appear why this proof was offered, and it obviously did not affect the verdict. Allbritton had stated that he was bound for an absolute fee of $250, in the case; and the proof seems to have been proper in that connection.

But if the evidence was offered to enhance damages, it seems to have been proper, as this was a case for punitive damages. In cases for exemplary damages, fees may be taken into consideration. Sedgwick Dam. 100, 101; *Linsley* v. *Bushnell*, 15 Conn. 236–7; *Whipple* v. *Cumb. Man. Co.* 2 Story R. 665.

As to Dr. Simms, it is said he was not an expert. He had practised medicine for six years, had attended one course of lectures in New Orleans, and had studied three years before he commenced practice. That would seem to suffice, though he was no "graduate." The learned counsel had full opportunity, but did not enter upon a medical examination. But the fact is, the witness gave no opinion, as an expert, except in answer to questions for defendant.

This court will not listen to any complaint against the amount given as damages, in a case like this. The public safety demands the example. It was no ordinary case of reckless misconduct. The wanton act of the engineer, endangered the lives of the passengers on both trains; and there are no circumstances of palliation. If we look to the decisions in *R. R. Co.* v. *Patton*, *Hiern* v. *McCaughen*, and *N. O. R. R.* v. *Hurst*, it is manifest that this ver-

dict cannot be disturbed. Hurst was carried beyond his landing about a quarter of a mile; and a verdict of $4500 was given, as exemplary damages, because the conductor refused to back-down for him. We need a like example, in a case endangering life and limb.

HARRIS, J., delivered the opinion of the court.

Under Article 86, p. 492, of the new Code, abolishing the distinction between actions of trespass *vi et armis*, and actions of trespass on the case, the defendant here filed his action in the court below, to recover of plaintiff in error, damages alleged to have been sustained by him, " *by a collision of the up and down mail and passenger trains on said road, caused by the gross carelessness, negligence, misconduct, and mismanagement* of the servants, agents, and conductors of the said railroad company."

The plaintiff in error filed an answer to this complaint, amounting to a " general denial " of the cause of action therein stated; and upon the issue thus joined, the cause was submitted to the jury. Only two exceptions to the *testimony* were reserved, in the progress of the trial. The first relates to the testimony of Dr. Simms; and the second to the admissibility of evidence to prove, by way of enhancing damages, the probable expense of the litigation in attorney's fees. The ruling of the court, on both these points, is in accordance with well-settled doctrines, not necessary to discuss here. No *motion* for a new trial appears on this record, except by the bill of exceptions, and we have *repeatedly* held that a bill of exceptions is not the proper medium through which to certify to this court matters which must necessarily be a part of the original record in the cause, if they exist at all.

The amended record, filed by consent of counsel, furnishes the *judgment* on the motion for a new trial. But a judgment without a cause of action, on which it is based, is as insufficient in judicial proceedings, brought to this court for revisal, as a cause of action without a judgment; *both* must appear in the transcript of the record, being necessary parts thereof, independent of the bill of exceptions, to enable this court to determine the error assigned thereon. The office of a bill of exceptions is to place upon record, by the direction of the court, or the law, such extraneous matters

VOL. IX.—18

as do not necessarily constitute a *part* of the record in the cause. But the pleadings of the parties and the judgments of the court thereon, not depending for their preservation on the optionary right to a bill of exceptions, must have a more certain foundation as a record, and higher evidence as such, than the *transcript of a bill of exceptions*, which is itself but a copy, in this respect, of a supposed matter of record. We cannot therefore notice this motion for a new trial.

This brings us to the consideration of the points presented by the instructions of the court below, which are fully exhibited in the record, together with the whole testimony.

As the three first charges given for the defendant in error are substantially embraced in the propositions reasserted in the fourth instruction, we will consider of them all in examining the fourth instruction given for the plaintiff below. That instruction is as follows: " That in an action against a railroad company, the facts that a collision took place, and that plaintiff was injured, are *prima facie* evidence of negligence or want of skill, of the agent in charge, and shifts the burden of proof upon the defendant, to show that the engineer was in every respect qualified, and acted with reasonable skill and the utmost caution; and if the disaster was occasioned by the least want of due skill, or of prudence on the part of the engineer in charge of the colliding engine, the defendant is liable, and the jury should find for the plaintiff, all actual and consequential damages, proved to their satisfaction; and may also find exemplary damages, provided the testimony in the cause shows that the plaintiff received a bodily injury, and that that injury was caused by the gross negligence or wanton and wilful misconduct of the engineer of defendants."

The first proposition here asserted, is that *a collision* is *prima facie* evidence of liability, and casts the *onus probandi* on the defendant.

This rule, in relation to passenger carriers, is correctly stated. " They are bound to the utmost care and diligence of very cautious persons; and of course they are responsible for any, even the slightest neglect." 2 Greenl. Ev. § 221.

" They are held to the strictest responsibility for care, vigilance, and skill on the part of themselves and all persons employed by

them, and *they are paid accordingly.* · The rule is founded on the expediency of throwing the responsibility upon those who can best guard against it." Shaw, C. J., in *Farwell* v. *Boston and Worcester Railroad Company,* 4 Met. (Mass.) R. 49. Mr. Angell says, " that the *onus probandi* is on the proprietor of the vehicle to establish that there has been *no disregard whatever of his duties,* and that the damage resulted from a cause which *human care and foresight* could not prevent, is well settled." Angell on Carriers, § 569; *Ingalls* v. *Bills,* 9 Met. (Mass.) R. 1; *Stokes* v. *Saltonstall,* 13 Peters R. (U. S.) 181; *Ware* v. *Gay,* 11 Pick. (Mass.) R. 106; *Chester* v. *Griggs,* 2 Campb. R. 79; *McKinney* v. *Niel,* 1 McLean, (Circuit Ct. R.) 540; *Carpue* v. *London and Brighton Railway Company,* 5 Adol. & Ell. R. (N. S.) 747.

The second branch of the instruction asserts, that if the railroad company failed to show, that the engineer was in every respect qualified and acted with reasonable skill, and the utmost caution, to prevent such collision, the company is liable for all actual and consequential damages proved; and for exemplary damages, at the discretion of the jury; provided that the testimony in the cause shows, that the plaintiff received a bodily injury, and that that injury was caused by the gross negligence or wanton and wilful misconduct of the engineer of defendants.

It is insisted on this point: 1st. That while the *principal* is responsible for the torts and negligences of his agent in the course of the agency, or even beyond such general agency, when expressly authorized, or subsequently adopted by the principal; yet he is never liable for the unauthorized, the wilful, or the malicious act, or trespass of his agent: and numerous cases and authorities are referred to in support of the limitation here contended for.

And it is urged in the second place, that notwithstanding the agent *still occupies the place and assumes to exercise the duties of his agency,* yet if, in doing so, he transgress the order of his principal, or by his wilful and malicious *abuse of the power derived from his agency,* inflict injury on the public, or third persons, the principal is not responsible, without proof of some guilty omission or participation in such wrongful conduct. And for *this,* respectable authority is not wanting.

It is lastly insisted, in relation to this instruction, that, at all

events, exemplary or punitive damages against the principal, for such wilful and malicious conduct, cannot upon any just principles, be visited upon the principal,—who is not only wholly innocent of intentional wrong,—but usually the greatest sufferer by such wrongful acts.

In the case before us, as it often happens in legal science, it will be found much more difficult to *reconcile* the apparently conflicting opinions of courts,—swayed by the peculiar hardships of the individual cases they have been called to decide,—with each other, or with true principles, than to ascertain the true principles themselves, which should guide us.

The foundation of the rule on this subject, is that the agent is but the instrument. That one having authority over the actions of another,—who for his own benefit places him in a condition to injure others, by the exercise of the powers conferred,—shall be responsible for the abuse of that power by his agent, as if it were the act of himself, whether such abuse be the result of negligence or wilfulness.

The true principle is thus stated by Judge Story, in his work on Agency, §§ 451, 452.

" In the next place, as to the liability of principals to third persons, for the acts of their agents, this topic may be dismissed in a few words ; for the whole doctrine turns upon the obvious maxim, that he who acts by another, acts by himself," quoting the maxim of the Roman Code (4 Inst. tit. 5), " *Qui facit per alium, facit per se,*" and citing numerous elementary writers for this foundation of the principle.

He then comes, in section 452, to treat of the " liability of the principal to third persons, for the misfeasances, negligences, and torts of his agent." " It is a general doctrine of the law," says he, " that although the principal is not *ordinarily* liable (for he sometimes is) in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has co-operated in those acts or misdeeds ; yet he is held liable to third persons, in a civil suit, for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances or misfeasances, and omissions of duty, of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of such mis-

conduct, or even if he forbade the acts, or disapproved of them. In all such cases, the rule applies, *respondeat superior*, and it is founded *upon public policy and convenience;* for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him, through the instrumentality of agents. In every such case, the principal holds out his agent as competent and fit to be trusted; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."

Mr. Angell, in his lucid work on Carriers, treating of passenger carriers, and of " their duties in repect to the character and competency of their servants," says : " The general rule, as to all persons professing to exercise any trade or employment, for all persons indifferently is, that *they are bound for a due application, on the part of their servants, of the necessary attention, art, and skill."* He applies the doctrine to stage-drivers, engineers, and switch-tenders on railroads, and says : " They must be such as are, in the first place, fully competent, and in the next, *careful and trustworthy,* in their general character." See sec. 540.

And in section 541, speaking of the duty of proprietors of public lines of conveyance, to employ temperate and discreet agents, he gives as a reason for the observance of this precaution : " for if the driver of a stage-coach, or the engineer of a railroad, is, under *any circumstances,* guilty of misconduct, rashness, or negligence, the proprietors will be responsible for any injury resulting therefrom."

In section 546, the same author says : " In short, when the carriage is by railroad, the company impliedly warrants the road to be in good travelling order, and fit for use; then, again, supposing the condition of the road itself to be ever so good, the conductor of the train is guilty of misconduct, by endeavoring to drive his train to a certain station before it is reached by a counter train; for if the conductors of both trains are governed by the same idea, the passengers are exposed to the dangers of a collision."

The rule may be thus stated :

In all cases where it appears that the employment of the principal afforded the agent the means or opportunity, which he used while so employed, in committing an injury on a third person, the

principal must be held responsible. The wilful trespass, or injury of the agent, derived from the authority confided to him by the principal, as a source of power, in the exercise of his master's employment, will make the principal responsible. And this upon the reason, that he who employs and confides, should be the loser rather than a stranger,—a rule of justice entirely consonant with the maxim of the Roman law already cited.

These doctrines are very fully considered, the cases reviewed, and all the objections to these instructions fully answered in this court, in the case of the *Vicksburg & Jackson R. R.* v. *Patton*, 31 Miss. R. 198.

The case of *McCoy* v. *McKeown*, 26 Miss. R. 487, and the case, *McManus* v. *Cricket*, 1 East, 106, on which it was based, are clearly distinguishable from the case before the court now, as well as the case of *Railroad* v. *Patton*.

They were both cases having no relation to the great principle of public policy and convenience, and, indeed, of public necessity, which gave rise to the rules regulating the responsibility of carriers. These rules have been extended by the courts, wisely, we think, to meet the enhanced facilities, dangers, and necessities, growing out of the new modes of travel invented by the age.

It is no answer to the soundness of these views to say, that the doctrine of *respondeat superior* thus extended, involves the innocent with the guilty. The books abound not only with strong cases of recovery against common carriers, *wholly without fault* on their part, sanctioned by the most learned judges, and enlightened courts; but their inflexibility in maintaining and even extending these salutary rules of law, without bending to popular sympathies, or yielding to the hardships of a particular case, has been the subject of just admiration and compliment. See 2 Kent (9th edit.), 812, 813.

Indeed, even *criminal* responsibility attaches to the principal for the acts of the agent, in some cases, where the principal is wholly ignorant of the act of the agent. See Wharton's American Cr. Law, § 153. We think there is no error, therefore, in the 1st, 2d, 3d, and 4th instructions given for plaintiff below.

The last instruction asked for the plaintiff, was asked as an explanation of a modification of one of the defendant's instructions.

That the force of this instruction may be seen more clearly, we state them in their order, in point of time.

The defendant below asked the following instruction, which was refused:

"The testimony of the plaintiff, by himself, may be entirely disregarded by the jury, if they think proper."

In lieu of this instruction, the court, without request, gave the following as a modification of the above charge so refused:

"The jury are the proper judges of the testimony of all the witnesses in the case. It is their right and province to weigh and consider that of the plaintiff; and if, after weighing and considering it, with all the other facts and circumstances of the case, as shown from the evidence, they should believe that it is untrue, they may so treat it, and entirely disregard it."

As an explanation of the foregoing last instruction, the court, at the instance of plaintiff, gave the following:

"To authorize the jury to disbelieve, and, consequently, to disregard the testimony of a witness, there must be something in his manner or conduct, in giving in his testimony, or in the testimony of the other witnesses in the cause, sufficient to satisfy the minds of the jury, that what the witness has stated is false."

Under these instructions, the jury were wholly denied the right to consider of the "interest" of the witness, as a party to the suit, in determining the weight to which his testimony was fairly entitled. They were confined to his "manner and conduct, in giving in his testimony," and to "the testimony of the other witnesses in the cause, sufficient to satisfy their minds that what he stated was false," and could not consider of his *direct interest*, in the event of the suit, which the statute gives them the right, and makes it their duty to consider.

It is said, in answer to this objection to the ruling of the court below, that this instruction could not have been prejudicial to the defendant below, as the testimony of plaintiff below was wholly immaterial, and might have been omitted. We cannot so regard it. On one of the main points in issue (the injury to the plaintiff below), from the very nature of the inquiry, it was the most important testimony in the cause, and we cannot say what influence it may

have exerted on 'the jury, in producing the verdict shown in this record.

For this error, let the judgment be reversed, cause remanded, and a *venire de novo* awarded.

HANDY, J., being a stockholder in the Railroad Company, did not sit in this cause.